**KERN–TULARE WATER DISTRICT, Plaintiff,**

v.

**The CITY OF BAKERSFIELD, Defendant.**

**No. CV–F–84–324 REC.**

United States District Court,
E.D. California.

March 31, 1986.

Thomas J. Anton, Anderson & Anton, Bakersfield, Cal., for plaintiff.

Richard Oberholzer, City Atty., Bakersfield, Cal., and Richard R. Terzian, Burke, Williams & Sorensen, Los Angeles, Cal., for defendant.

## DECISION AND ORDERS

COYLE, District Judge.

### I.

### INTRODUCTION

Plaintiff's First Amended Complaint ("Complaint"), filed September 20, 1984, alleges Sherman Act violations, breach of contract, and unfair competition arising out of a contract to purchase water from defendant. This court has jurisdiction pursuant to 15 U.S.C. § 15, which creates federal jurisdiction for claims arising under the Sherman Act, and under pendent jurisdiction.

Defendant moves for summary judgment on the ground that it is immune from liability under the federal antitrust laws under the doctrine of state action immunity. In the alternative, defendant requests this court's abstention. Defendant also moves to dismiss the pendent claims. Defendant further moves the court to reconsider its order of March 26, 1985 regarding the applicability of the Local Government Anti-Trust Act of 1984, 15 U.S.C. section 34 *et seq.*, and to certify that order, as well as this order for interlocutory appeal in the event the court denies its motion for summary judgment. The court heard oral argument on these motions on December 16, 1985, following which the court placed the matters under submission. After a thorough review of the written and oral arguments of the parties, the court now enters its orders denying the motion for summary judgment, the motion for abstention, and the motion for reconsideration. The court will certify this order, as well as the order of March 26, 1985, however, for interlocutory appeal to the Ninth Circuit.

### II.

### FACTS

In 1976, defendant acquired all of Tenneco West Inc.'s Kern River water rights and related facilities in Kern County. Thereupon, defendant and plaintiff entered into a long-term contract ("contract"), which is exhibit one to the complaint. The contract has a term of thirty-five years, and in essence requires the plaintiff to pay the defendant $40,000 annually for 20,000 acre-feet of water per year.

In 1983 plaintiff desired to sell the bulk of its 1983 entitlement to other water districts. The City refused to permit the sale, invoking Clause 7.1 of the contract, which conditions and limits plaintiff's use of water purchased from defendant. *See* Agreement No. 76–61, Exhibit 1 to Complaint, page 28–29. As a result of defendant's refusal to consent, plaintiff claims it lost sales of the 1983 entitlement, thereby allegedly damaging plaintiff in the sum of $340,000.

Based upon these factual allegations, the complaint sets forth four different legal theories for relief in four counts. Count One alleges that the City's refusal to consent is a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 constituting a restraint of trade. In Count Two, plaintiff alleges that defendant violated section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in certain specified "monopolistic" activities in the market for uncommitted irrigation water in Kern County. Count Three is a pendent state law claim for breach of contract, and Count Four is a pendent claim for unfair competition under California Business and Professions Code § 17200.

### III.

### MOTION FOR SUMMARY JUDGMENT

Defendant's motion for summary judgment presents the court with one issue: Whether defendant, a municipality, is protected under the doctrine of "state action

immunity" from liability under the federal antitrust laws.

### A. State Action Immunity Doctrine.

The state action immunity doctrine, first articulated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), exempts a municipality from federal antitrust liability for its anti-competitive acts when the municipality acts pursuant to a state policy to displace competition with regulation. *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978). The policy must be clearly articulated and affirmatively expressed. *Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). The Ninth Circuit has adopted a two-part test for assessing the availability of municipal state action immunity:

> To prove that a policy is clearly articulated and affirmatively expressed, the City must demonstrate not only the existence of a state policy to displace competition with regulation, but also that the legislature contemplated the kind of actions alleged to be anti-competitive.

*Grason Electric Company v. Sacramento Municipal Utility District*, 770 F.2d 833,

835–836 (9th Cir.1985); *Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1412 (9th Cir.1985); *Lorrie's Travel and Tours, Inc. v. SFO Airporter, Inc.*, 753 F.2d 790, 792 (9th Cir.1985); *Tom Hudson & Associates, Inc. v. City of Chula Vista*, 746 F.2d 1370, 1373 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985). *Accord Town of Hallie v. City of Eau Claire*, —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). The clearly articulated state policy need not compel the anticompetitive conduct, and the state policy may be inferred from the "broad authority to regulate." *Town of Hallie v. City of Eau Claire*, —— U.S. at ——, 105 S.Ct. at 1718, 85 L.Ed.2d at 31. *See also Grason Electric Company v. Sacramento Utility District*, 770 F.2d at 836–837.

Thus, in determining whether defendant here is protected by the state action immunity, the enquiry is whether defendant's alleged anti-competitive conduct was pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with regulation or monopoly in the provision of water resources, and whether the legislature contemplated the kind of actions alleged to be anti-competitive.[1]

---

1. Both parties engage in a lengthy discussion about the applicability of *Garcia v. San Antonio Municipal Transit Authority*, —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) to this case. There, the Supreme Court held that the overtime and minimum wage requirements of the Fair Labor Standards Acts ("FLSA") applied to employees of a municipally-owned transportation system. The court reasoned that applying the FLSA to municipal employees contravened no affirmative limit on Congress' power under the commerce clause of the United States Constitution. In so holding, the court discarded the concept of "governmental" versus "proprietary" function as a criterion for characterizing actions of a local public agency for purposes of applying the FLSA.

Plaintiff argues that because state action immunity is not based on constitutional interpretation, the *Garcia* case does not apply to it. "The 'proprietary/governmental' distinction remains viable when applying the antitrust laws to the cities." Plaintiff's response, page 15. Thus, plaintiff's argument goes, defendant's activities were "proprietary" rather than "governmental"

and not subject to immunity from the antitrust laws.

Defendant, on the other hand, contends that *Garcia* is applicable as reflecting the intent of Congress in enacting the Sherman Act under the Commerce Clause. *See* Defendant's Reply Brief, page 9. In other words, the Supreme Court in *Garcia* expressed a rationale as to when any legislation enacted under the Commerce Clause is constitutionally applicable to a municipality. Because Congress enacted the Sherman Act pursuant to its power to regulate interstate commerce, *Garcia* applies here, and eliminates any distinction between proprietary and governmental function regarding the state action immunity doctrine.

The court believes that *Garcia* simply does not affect this case. The test for establishing state action immunity is thoroughly laid out in *Hallie* and the above-cited authority. None of the cases uses the governmental/proprietary distinction as a basis for decision. Chief Justice Burger in his concurring opinion in *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. at 417, 98 S.Ct. at 1138, 55 L.Ed.2d at 386–391, did utilize

*Town of Hallie v. City of Eau Claire,* —— U.S. at ——, 105 S.Ct. at 1718, 85 L.Ed.2d at 34.

### B. *State Policy.*

There is probably no subject which has been the source of more legislation, or litigation in California than the storage, use, and distribution of water resources. Plaintiff and defendant have divergent views as to what the state water policy is, and each points to specific statutory provisions supporting its view. In essence, defendant argues that the "elaborate web of state regulation, storage, sale and use of water" shows that "the state has substituted a controlled market for a free market in the acquisition, storage, sale and use of water." Defendant's Reply Brief, pages 11 and 16. On the other hand, plaintiff contends that water legislation enunciates a policy encouraging beneficial use and free transfer of water rights; thus, defendant's acts "constitute an attempt to monopolize and destroy competition [and] are totally in contravention of what the state seeks to do pursuant to its enunciated policy." Plaintiff's Brief, page 33.

■ Although the court is unconvinced that the sheer bulk of state water regulation evidences a state policy to substitute monopoly for competition, the court agrees with defendant that municipalities are authorized to acquire water rights and contract to supply water. This authorization is found in the state constitution:

A municipal corporation may establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation, or means of communication. It may furnish those services outside its boundaries, except within another municipal corporation which furnishes the same service and does not consent.

Cal. Const. Art. XI, § 9(a) (added June 2, 1970). Pursuant thereto, section 38742 of the California Government Code empowers a city to enter contracts for supplying its inhabitants with water:

The legislative body of any city may:
(a) Contract for supplying the city with water for municipal purposes.
(b) Acquire, construct, repair, and manage pumps, aqueducts, reservoirs, or other works necessary or proper for supplying water for the use of the city or its inhabitants or for irrigating purposes in the city.

.  .  .  .  .

Cal.Govt.Code § 38742 (a) and (b) (West 1971). Section 38730 of the California Government Code further empowers a city to acquire by purchase or condemnation water, water rights, and related facilities "to supply water for the use of the city and its inhabitants." Cal.Govt.Code § 38730 (West 1971). The right of a municipality to acquire and hold water rights is also protected by section 106.5 of the California Water Code, which declares that "It is ... the established policy of this state that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for existing and future uses...." Cal.Water Code § 106.5 (West 1971). *See also* Cal. Water Code § 1005 (Water Commission Act of 1914 does not deprive municipalities of right to appropriate water); Cal.Water Code § 1006 (Water Commission Act of 1914 does not affect municipalities' pre-1914 water appropriations).

These state statutes appear to represent at least as broad a grant of authority to regulate as those involved in *Grason Electric v. Sacramento Municipal Utility District,* 770 F.2d at 833. There, the Ninth Circuit found sufficiently clear articulation in a statutory scheme authorizing municipalities to provide utility services. The

---

this distinction in deciding that the city could not involve state action immunity. But neither the plurality opinion in that case or the majority opinion in *Town of Hallie v. City of Eau-Claire* incorporated that reasoning.

Accordingly, whether defendant's conduct was proprietary or governmental is not the relevant consideration. Rather, whether state action immunity applies turns upon the analysis in the text.

constitutional authorization for regulation, the court found, stemmed from the California Constitution, article XI, section 9, which also authorizes municipalities to purchase water rights and supply water to their inhabitants. California law clearly authorizes and envisions municipalities such as defendant to acquire water rights and supply water to its inhabitants. Thus, the court believes that California has enacted a statutory scheme that vests authority in municipalities to restrict competition in the provision of water. Other cases hold that similar statutory grants of authority to supply services express a clearly articulated policy to replace competition with monopoly. *See Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d at 1396 (statute providing that cities "may" franchise cable television system articulated policy); *Lorrie's Travel & Tours, Inc. v. SFO Airporter, Inc.*, 753 F.2d at 790 (statute allowing city to regulate airport articulated policy to restrict competition in provision of ground transportation); *Springs Ambulance v. City of Rancho Mirage*, 745 F.2d 1270 (9th Cir.1984) (statute allowing cities to contract for ambulance services articulates policy to displace competition); *Hybud Equipment Corp. v. City of Akron, Ohio*, 742 F.2d 949 (6th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985) (statutory delegation to city to provide waste disposal services expresses policy.)

But this case is different than those cited, because in the area of water resources, California has an overriding policy that state water resources are to be utilized efficiently. Wells A. Hutchins summarizes this policy in his authoritative book, *The California Law of Water Rights*, at pages 11–12:

The courts have consistently recognized the essential part played by the utilization of water in the economy of California. In the earliest days of statehood the policy of the State conferred the privilege of mining gold on the public lands and equally the privilege of diverting streams from their natural channels for beneficial purposes, not only for working the mines but for other purposes as well. With the passing of the years and the growth of other industries, it has become 'an obvious proposition that the development of the state's resources—its agricultural, horticultural, stock-raising, power, and other like industries—depends largely upon the fullest use of the water supply of the state'—not only the waters of nonnavigable streams, but also those of navigable streams where the use for purposes other than navigation does not materially interfere with navigability.

The policy inherent in the State water law is to utilize all water available; to encourage the impounding and distribution of storm and flood waters whenever it may be done without substantial damage to existing rights; and to require the greatest number of beneficial uses that the water supply can yield. The limited quantity of water available necessitates careful economy in its use. Clearly the policy of the law is to require, within reasonable limits, the highest and greatest possible duty from the waters of the State in the interests of agriculture and other useful and beneficial purposes. The legislature has declared in the Water Code that the people have a paramount interest in the use of all the water of the State, and that the State shall determine what surface and ground water can be developed for the greatest public benefit, and in what way.

It is not the policy of the law to permit water to remain unused by a claimant of a water right while it can be beneficially used by others. 'The use of water in this state is of such great necessity as to preclude its being allowed to run to waste, * * *.' The State has a definite interest in seeing that none of the valuable waters of any of its streams shall go to waste.

(footnotes omitted) *See also* C. Craig, "California Water Law in Perspective," printed in West's Annotated Water Code, pages LXV–CVIII.

As stated by Mr. Hutchins, California water policy is articulated in Article 10,

section 2 of the state constitution (adopted in 1982 as Article 14, section 3), which provides:

It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.... This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained.

Cal. Const. Art. X, § 2 (West 1971). This section has become the keystone of California water law, making the doctrine of reasonable use applicable to all water rights enjoyed or asserted in California. *See National Audubon Society v. Superior Court*, 33 Cal.3d 419, 443, 189 Cal.Rptr. 346, 658 P.2d 709 (1983). The California legislature had implemented these constitutional commandments through enactment of several provisions of the water code,[2] including section 106.5. That statute, while granting municipalities the right to acquire and hold water rights, also prohibits waste and unreasonable use,

[N]o municipality shall acquire or hold any right to waste water, or to use water for other than municipal purposes, or to prevent the appropriation and application of water in excess of its reasonable and existing needs to useful purposes by others subject to the right of the municipality to apply such water to municipal uses as and when necessity therefor exists.

Cal.Water Code § 106.5 (West 1971).

Further, to effectuate efficiency, the legislature has expressly encouraged voluntary transfer and transfer of water rights:

§ 109. Efficient use of water; encouragement of voluntary transfer of water and water rights

(a) The Legislature hereby finds and declares that the growing water needs of the state require the use of water in an efficient manner and that the efficient use of water requires certainty in the definition of property rights to the use of water and transferability of such rights. It is hereby declared to be the established policy of this state to facilitate the voluntary transfer of water and water rights where consistent with the public welfare of the place of export and the place of import.

*(b) The Legislature hereby directs the Department of Water Resources, the State Water Resources Control Board, and all other appropriate state agencies to encourage voluntary transfers of water and water rights, including, but not limited to, providing technical assistance to persons to identify and implement water conservation measures which will make additional water available for transfer.*

Cal.Water Code § 109 (West Supp.1985). Thus, while the legislature has granted municipalities the power to acquire water rights and distribute water to its inhabitants, that grant of power must be inter-

---

**2.** Section 100 of the California Water Code provides that the state's water resources be put to beneficial use "to the fullest extent of which they are capable" and that conservation is to be exercised "with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." Cal.Water Code § 100 (West, 1971).

Section 102 of the California Water Code declares that "all water within the state is the property of the people of the state," but provides for the acquisition of rights to use water.

Section 104 of the California Water Code grants the state the right to determine what water of the state can be converted to public use.

preted in light of the state's general water policy to avoid waste and encourage voluntary transfers. With this in mind, the court determines whether defendant is entitled to protection under the state action immunity doctrine.

### C. *Application.*

█ Defendant's acts which are the gravamen of this suit clearly were done pursuant to one state policy. In accordance with legislative authorization found in section 38742 of the California Government Code, defendant adopted ordinances creating a water board and giving the Board certain powers and duties. *See* Defendant's Exhibit A. In order to provide water for its inhabitants, defendant filed an action for condemnation of Tenneco's Kern River water rights and facilities. When defendant ultimately agreed to purchase these water rights, it issued general obligation bonds to finance the acquisition.[3] *See* Declaration of Thomas M. Stetson, ¶¶ 3, 4. Defendant's contract to purchase the water rights owned by Tenneco West, and the contract to sell surplus water to plaintiff, were pursuant to its broad statutory authorization to provide water for the inhabitants of the City of Bakersfield, and accordingly were pursuant to a clearly articulated state policy.

But while it is clear that defendant's purchase and supply of water for the City of Bakersfield was done pursuant to one state policy, it is equally apparent that the allegedly anti-competitive acts giving rise to this lawsuit were directly contrary to the state policy favoring efficient use and free transferability of water resources. Defendant enforced a provision of the contract to prevent plaintiff from transferring its 1983 entitlement to an end user who presumably could make more efficient use of the water. These actions violate the spirit of California Water Code sections 106.5 and 109 if not the commands of the statutes themselves. Indeed, it is hard to square defendant's actions with state water policy especially when the water ultimately went into the state aqueduct and was lost to the Kern County water basin. *See* Exhibit B to Defendant's Joint Status Report. Defendant's restrictions on transfer and refusal to consent to plaintiff's sale of water therefore resulted in waste and inefficiency—a result not "reasonably designed to promote the state aims within a designated field of regulation."[4] *See Hybud Equipment Corp. v. City of Akron, Ohio,* 742 F.2d at 961. Defendant may have had the legal authority to engage in the challenged activity, but that is not enough to invoke state action immunity. In light of the overwhelming state policy favoring free transfer and efficient use of water resources, expressed in numerous and explicit statutes, the court cannot say that defendant's allegedly anti-competitive acts were contemplated by the state legislature. *See Hallie v. Eau Claire,* —— U.S. at ——, 105 S.Ct. at 1713, 85 L.Ed.2d at 24.

---

**3.** Sections 43601–43602 of the California Government Code authorizes municipalities to incur indebtedness for water works and water rights subject to a two-thirds vote of the people. Additionally, section 38742(c) of the water code authorizes use of general obligation bonds to finance such acquisitions. Although authorization for public financing is not sufficient alone to express a "clearly articulated" state policy to displace competition, it is certainly evidence of such expression. *Cf. Hybud Equipment Corp. v. City of Akron, Ohio,* 742 F.2d at 962.

**4.** Defendant points to section 382 of the water code as authorization for its actions. That section provides:

> Notwithstanding any other provision of law, every local or regional public agency authorized by law to serve water to the inhabitants of the agency may sell, lease, exchange, or otherwise transfer water that is surplus to the needs of the agency's water uses for use outside of the agency. The authority granted to local and regional public agencies by this chapter shall not be construed as prohibiting or restricting the transfer of water or water rights pursuant to authority granted such agencies by provisions of law other than this chapter.

Cal.Water Code § 382 (West Supp.1985). But defendant's reliance is misplaced, for that section applies only to water rights held pursuant to an appropriation made *after* 1914. The water rights at issue here, however, are pre-1914 rights because they were acquired by the seller Tenneco West, Inc. and its subsidiaries prior to 1914. *See* Declaration of Stanley C. Hutch.

Defendant vigorously argues that state action immunity is not lost when the municipality's action violates state law, if done pursuant to state authorization. This argument is correct, but misconstrues the real issue in this motion. Professor Areeda explains that:

> If an allegation of agency error or other unauthorized action is enough to deny antitrust immunity for public agencies, virtually every zoning decision, franchise grant, utility tariff ruling, or other routine governmental act will be subject to antitrust scrutiny.... The antitrust court should require no more than that the result of the agency's act or decision was of the sort contemplated by the state anti-competitive policy. Ordinary errors or abuses in the administration of jurisdiction conferred by the state should be left for state tribunals to review.

P. Areeda, 1 ANTITRUST LAW, ¶ 212.3b at 57 (Supp.1982). Here, there is no question that defendant was empowered to buy and sell water rights and supply its citizens with water. The issue here is not whether defendant, by engaging in the allegedly anti-competitive activity, violated the state law authorizing such activity, but whether the allegedly anti-competitive acts were contemplated by the state legislature. The court is determining whether defendant is entitled to state action immunity, not whether it has lost immunity already conferred.

Indeed, the case cited by defendants as "the most significant case" on this contention supports the court's decision. In *Scott v. City of Sioux City, Iowa*, 736 F.2d 1207 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985), plaintiff alleged that defendant city was not protected by state action immunity because, among other things, defendant violated state mandated procedures in passing the challenged ordinances. The Eighth Circuit concluded that

> [We do not] find the appellant's allegation that the city departed from the state mandated procedures in passing the challenged ordinances adequate grounds for stripping the city of immunity. The

city's departure from state procedural requisites would have to be extreme to warrant. the threat of antitrust liability. State authorization for antitrust purposes does not require administrative decisions that are free from ordinary errors.

736 F.2d at 1215–16. But the court does not hold that defendant departed from state procedural requirements or otherwise violated the statutes authorizing defendant's activity. The court holds that defendant's acts contravened state water policy and therefore could not have been contemplated by the legislature. The other cases cited by defendant are also distinguishable in the same way. *See Golden State Transit v. City of Los Angeles*, 726 F.2d at 1430; *Campbell v. City of Phoenix*, 1983 Tr. Cases (CCH) ¶ 65,753 (D.Ariz.1984); *Llewellyn v. Carothers*, 1983 Tr. Cases (CCH) ¶ 65,358 (D.Ore.1983).

Because defendant is not protected by state action immunity, and in the absence of any material issues of fact, the court denies the motion for summary judgment. Fed.R.Civ.P. 56.

### D. *Pendent State Claims.*

Defendant moves to dismiss the pendent state claims, plaintiff's third and fourth counts, arguing that because defendant is immune on the federal antitrust claims, the pendent claims should be dismissed as well. But denial of summary judgment renders this decision unnecessary.

## IV

### MOTION FOR ABSTENTION

■ In the event the court denies the motion for summary judgment, defendant seeks abstention in order to allow the matter to be determined in state court.

The Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483, *reh. denied*, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976), recog-

nized three types of abstention used by federal courts:

(1) Abstention is appropriate in case presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law. (*"Pullman"* abstention);

(2) Abstention is appropriate where there have been presented difficult questions of state law bearing on the policy problems of substantial public import whose importance transcends the result in the case then at bar; (*"Burford"* abstention);

(3) Abstention is appropriate where federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings. (*"Younger"* abstention).

424 U.S. at 814–816, 96 S.Ct. at 1244–45, 47 L.Ed.2d at 496–97.

Defendant does not contend that the third type of abstention is applicable, but argues that (1) or (2) applies to this case.

This case is inappropriate for *Pullman* abstention because this case presents no unsettled questions of state law that may be dispositive of the case and avoid the need for decision on a federal constitutional question. *See* 17 C. Wright, A. Miller and E. Cooper, *supra*, § 4272 at 449. Indeed, this case really involves no federal constitutional question.

*Burford* type abstention is also inappropriate here. As explained by Justice Brennan:

(b) Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.

.    .    .    .    .

In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Colorado River Water Conservation District v. United States*, 424 U.S. at 814–15, 96 S.Ct. at 1244–45, 47 L.Ed.2d at 496–97. Undoubtedly, defendant is correct that "adjudication of water rights in arid western states is peculiarly one involving important issues of state law and goes to the heart of vital states policies." Defendant's Brief, page 39. But the present case is not an adjudication of water rights, rather, it is an antitrust claim arising out of federal law. Issues of state policy are relevant only to determining whether state action immunity should apply, and a decision on that question will have little or no impact upon implementation of state policy. Further, plaintiff's state law claims do not involve adjudication of water rights, but are based on settled principles of contract and unfair competition.

Neither would the exercise of federal review in this case be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern. This case does not involve review of state administrative decisions, which is the situation in which this form of abstention was created, *see Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or implementation of state water policy. California water law is germane here only to determine whether state action immunity applies.

Finally, defendants claim that abstention is proper in this case based on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River Water Conservation District v. United States*, 424 U.S. at 817, 96 S.Ct. at 1246, 47 L.Ed.2d at 498.

In *Colorado River Water Conservation District v. United States*, 424 U.S. at 800, 96 S.Ct. at 1236, the federal government brought suit in federal court in Colorado to adjudicate reserved water rights claimed on behalf of itself and certain Indian tribes. A stream adjudication involving these same rights was pending in a state court. Because both actions would achieve the same

end, the Supreme Court decided that it would be a waste of judicial resources to allow both actions to continue and therefore the district court should abstain.

Duplicity of litigation is not an issue here. A lawsuit to settle water rights in the Kern River, including defendant's, is pending in state court, but that case will have no effect on this litigation. The present case is not a stream adjudication. It is based on claims of breach of contract, unfair competition, and violations of the Sherman Antitrust Act. There will be no duplication of judicial effort if both actions are pursued; accordingly, the reasoning of *Colorado River Water* does not apply.

■ A court should rarely invoke abstention. In *Colorado River Water*, the Supreme Court stated:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.' *County of Allegheny v. Frank Mashuda Co.* 360 US 185, 188–189, 3 L Ed 2d 1163, 79 S Ct 1060 [1062–63] (1959).

424 U.S. at 813, 96 S.Ct. at 1244, 47 L.Ed.2d at 495–96. Defendant has shown no such exceptional circumstances here. It would be unnecessary and wasteful to abstain from this case merely to allow a state court to determine California water policy, a subject which is unambiguous. The court therefore denies the motion to abstain.

## V.

### MOTION FOR RECONSIDERATION AND CERTIFICATION FOR INTERLOCUTORY APPEAL.

#### A. *Motion for Reconsideration.*

In the event the court denies defendant's motion for summary judgment, defendant moves for a reconsideration of the court's order of March 26, 1985. In that order, the court ruled that the Local Government Antitrust Act ("LGAA"), 15 U.S.C. section 34 *et seq.*, did not apply retroactively to defendant, thereby making it potentially liable for antitrust violations.

■ The order of denial of summary judgment is an interlocutory decree, *United States v. Florian*, 312 U.S. 656, 61 S.Ct. 713, 85 L.Ed. 1105 (1941), and accordingly the court in its discretion may reconsider such order. *See Major v. Benton*, 647 F.2d 110 (10th Cir.1981); *Kirby v. P.R. Mallory & Co., Inc.*, 489 F.2d 904, 913 (7th Cir. 1973); *Middle Atlantic Utilities Co. v. S.M.W. Development Corp.*, 392 F.2d 380, 384 (2d Cir.1968). *See generally* C. Wright, A. Miller & E. Cooper, 18 FEDERAL PRACTICE AND PROCEDURE, § 4478 at 788–791 (1982). The Seventh Circuit has stated:

> If good reason is shown why a prior denial of a motion for summary judgment is no longer applicable or should be departed from, the trial court may, in the exercise of sound discretionary power, consider a renewed motion for summary judgment, particularly when the renewed motion is based on an expanded record.

*Kirby v. P.R. Mallory & Co., Inc.*, 489 F.2d at 913.

■ Courts have distilled various grounds for reconsideration of prior rulings into three major grounds for justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or prevent manifest injustice. *See generally* C. Wright, A. Miller & E. Cooper, *supra*, § 4478 at 790. *See also Major v. Benton*, 647 F.2d at 112. Defendant argues that the court should reconsider its order in light of *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), in which the Supreme Court eliminated the "proprie-

tary" versus "governmental" distinction in determining whether the Commerce Clause empowered Congress to enforce the minimum wage and overtime provisions of the Fair Labor Standards Act against the States. "Since this distinction is critical to this Court's reasoning in its March 26, 1985 Order," defendant argues that " ... the court may wish to re-evaluate its decision."

A review of the order reveals, however, that the governmental/proprietary function distinction was not critical to the court's decision. In the order, the court does note that "In the instant case defendant engaged in a proprietary, as opposed to governmental, function when it contracted to sell the water of the Kern River to plaintiff"; Order, page 5; yet that distinction was not crucial to the court's decision. Rather, the court reasoned that any judgment would be satisfied by the City of Bakersfield Water Facilities Corporation; and "it is not at all certain under the facts now before the court that this extensive, on-going commercial enterprise would be unable to satisfy a judgment from its own resources...." Order, page 5. The capitalization of the City of Bakersfield Water Facilities Corporation, not whether the conduct engaged in was governmental or proprietary, was the determinative factor. Thus, *Garcia* has no bearing on the decision. Regardless of whether the court characterized defendant's actions as proprietary or governmental, the fact remains that the city and its taxpayers will not be burdened by the rendering of a money judgment against defendant in this case.

Defendant also argues that the court should reconsider its order in light of *Woolen v. Surtran Taxicabs*, 615 F.Supp. 344 (N.D.Texas 1985). In that case, plaintiffs were independent taxicab drivers contending that their exclusion from the Dallas/Fort Worth Regional Airport violated the Sherman Act. One of the questions considered by the Court was whether the plaintiff's claims for damages should be dismissed under the LGAA. The court held that the LGAA should apply, primarily because of the stage of litigation and the availability of alternative relief.

*Woolen* is an instructive exposition of the LGAA, and is certainly worth consideration. It does not, however, require reconsideration of the March 26, 1985 order. First and foremost, *Woolen* is not controlling authority in this district. Also, section 3(b) of the LGAA indicates that retroactivity will depend upon the circumstances of each case. In *Woolen*, the court determined that the age of the litigation, seven years, did not bar retroactivity because discovery was not completed before the effective date of the LGAA. This court determined that although the pending litigation was in its "infancy," that fact when weighed against the other factors was insufficient to tip the scales of equity in defendant's favor. This represents not a conflict in authority, or an improper decision, but differences in outcome based upon the circumstances of each case. Such results were clearly contemplated by the LGAA.

The court believes that the authority cited by defendant does not constitute an intervening change in controlling law requiring reconsideration of the order of March 26, 1985. Nor does the court believe that reconsideration is necessary to correct a "clear" error. Accordingly, the court will deny the motion for reconsideration.

### B. *Motion for Interlocutory Appeal.*

■ Defendant also moves the court to amend this order, as well as the order of March 26, 1985, to allow for immediate interlocutory appeal to the Ninth Circuit pursuant to 28 U.S.C. section 1292(b). That statute provides:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be

taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order. 28 U.S.C. § 1292(b). Thus, under this section, a district court has discretion to certify an order for interlocutory appeal if all of the three following criteria are met:

(1) The order involves a controlling question of law;

(2) There is substantial grounds for difference of opinion; and

(3) An immediate appeal from the order may materially advance the ultimate termination of the litigation.

*In re Cement Antitrust Litigation* (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir.1982).

The court finds that with regard to the instant order, these criteria are met. An immediate appeal from the order might terminate the litigation because plaintiff does not seek injunctive relief. The summary judgment motion involves a single controlling question of law; that is, whether defendant is protected under the state action immunity doctrine. Although strong disagreement with a ruling does not mean that there is a "substantial ground" for difference of opinion, here, the application of state action immunity in the context of California's unique and Janus-headed water policy allows a difference of opinion for

stronger than mere adversarial disagreement.

As to the order of March 26, 1985, both sides agree that an appeal from that order would materially advance the ultimate termination of the suit. They disagree, however, as to whether the order involves a controlling question of law for which there are substantial grounds for difference of opinion. Plaintiff argues that the order does not involve a question of law but is "based upon a factual determination which is left to the discretion of the judge." Plaintiff's Brief in Opposition to Motion for Reconsideration, page 12. But it seems that the order involves no questions of fact; rather, it presents only the legal question of whether under these facts and circumstances the LGAA retroactively applied to defendant. Reversal of the court's decision on appeal would terminate the lawsuit. Given the variety of factors bearing on this decision, the circumstances of this case, and the sparsity of authority interpreting the LGAA, it is the court's opinion that there are substantial grounds for difference of opinion.[5]

Defendant makes a strong argument for certification—if the retroactivity of the LGAA is not considered by the Court of Appeals at this time, defendant might never be able to appeal the issue adequately. The LGAA provides:

[U]nless the defendant establishes and the Court determines, in light of all the circumstances, including the state of liti-

---

**5.** The court also doubts whether the court's decision under the LGAA is to be reviewed under an abuse of discretion standard, as plaintiff contends. When the standard of review is abuse of discretion, interlocutory appeal may not be appropriate primarily because of a low probability of reversal. In any case, the court does not think the issue controlling inasmuch as the Ninth Circuit has rarely hesitated to accept interlocutory appeals for cases reviewable only for abuse of discretion or for application of impermissible legal criteria. *See, e.g., In re Coordinated Pretrial Proceedings, Etc.,* 691 F.2d 1335 (9th Cir.1982). The distinction between "discretionary" and "nondiscretionary" cases is certainly questionable, as stated by the Third Circuit with these apt words:

The key consideration is not whether the order involves the exercise of discretion, but whether it truly implicates the policies favor-

ing interlocutory appeal. The determination of what orders are properly reviewable under § 1292(b) must be made by a practical application of those policies, not by a mechanical application of labels such as 'discretionary' or 'nondiscretionary.' Those policies, both before and since the enactment of § 1292(b) have included the avoidance of harm to a party pendente lite from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense. In this case, as subsequent discusion will disclose, there exists by virtue of the order appealed from both the possibility of prejudice to a party pendente lite and the possibility of considerable avoidable wasted trial time and litigation expense.

*Katz v. Carte Blanche Corporation,* 496 F.2d 747, 756 (3d Cir.1974).

gation and the availability of alternative relief under the Clayton Act, that it will be inequitable not to apply this subsection to a pending case. *In consideration of this section, existence of a jury verdict, district court judgment, or any stage of litigation subsquent thereto, shall be deemed to be prima facie evidence that subsection (a) shall not apply.* 15 U.S.C. § 15(b) (emphasis added). Consequently, if this case goes to judgment, and plaintiff wins, defendant will face a heavier burden in showing that the LGAA is applicable retroactively. An appeal now, however, will allow defendant to present the issue squarely to the Ninth Circuit. In the court's opinion, this is an exceptional circumstance justifying interlocutory appeal. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 57 L.Ed.2d 351, 98 S.Ct. 2454 (1978).

The court concludes that in the exercise of its sound discretion, it will grant the motion to certify the orders for interlocutory appeal. The general purpose of section 1292(b), expressed in its legislative history, is to avoid protracted and expensive litigation:

> [Interlocutory appeal] should and will be used only in exceptional cases where a decision of the appeal may avoid protracted and expensive litigation, as in antitrust and similar protracted cases.... It is not thought that district judges would grant the certificate in order litigation which could otherwise be promptly disposed of or that mere question as to the correctness of the ruling would prompt the granting of the certificate.

Report, 1958 U.S.Code Cong. & Admin. News 5260–5261. *See also Paschall v. Kansas City Star Co.*, 605 F.2d 403, 406 (8th Cir.1979). The court's decision to allow interlocutory appeal in this potentially protracted and expensive antitrust action comports with this policy.

Accordingly, this order and the court's order dated March 26, 1985 shall be amended pursuant to 28 U.S.C. section 1292(b) to allow interlocutory appeal of those orders to the Ninth Circuit Court of Appeals.

## VI.

### CONCLUSION

The court concludes that although defendant acted pursuant to a clearly articulated state policy to displace competition, the challenged acts contravened clearly expressed state policy regarding utilization of water resources and therefore were not contemplated by the legislature. Accordingly, defendant is not immune from federal antitrust liability under the state action immunity doctrine. This conclusion expresses no opinion on the underlying merits of the case, of course, but it does compel denial of defendant's motion for summary judgment.

Defendant's motion for summary judgment is therefore DENIED. The motions for abstention and reconsideration are also DENIED. The motion for certification for interlocutory appeal is GRANTED as set forth herein.

IT IS SO ORDERED.